**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MICHAEL BURKE,                        )
     Plaintiff       )    **C.A. 09-212 Erie**
             )
  v.           )
             )    **Magistrate Judge Baxter**
DR. MARK BAKER, et al.,    )
     Defendants.    )


**OPINION AND ORDER**

United States Magistrate Judge Susan Paradise Baxter


**I.**  **INTRODUCTION**

  **A.**  **Relevant Procedural History**

   On August 18, 2009, Plaintiff Michael Burke, a prisoner incarcerated at the State Correctional Institution at Albion, Pennsylvania ("SCI-Albion"), filed this civil rights action pursuant to 42 U.S.C. § 1983 against the following Defendants: Dr. Mark Baker ("Baker"), a physician under contract with the Department of Corrections ("DOC") to provide medical services to inmates at SCI-Albion; Christine Zirkle ("Zirkle"), a nurse employed by the DOC at SCI-Albion; Maxine Overton ("Overton"), Chief Health Care Administrator at SCI-Albion; and C.O. Byerly ("Byerly") and C.O. Boyd ("Boyd"), corrections officers at SCI-Albion. [ECF No. 9, Complaint]. All Defendants other than Defendant Baker will hereafter be referred to collectively as "DOC Defendants."

   In his *pro se* Complaint, Plaintiff claimed that Defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights.

   Both Defendant Baker and the DOC Defendants filed motions to dismiss [ECF Nos. 14 and 27, respectively] asserting that Plaintiff failed to state claims against them upon which relief may be granted. On May 13, 2010, this Court issued a Report and Recommendation ("R&R") recommending that Defendant Baker's motion to dismiss be granted, and that the DOC

Defendants' motion to dismiss be granted as to Plaintiff's claims against Defendants Boyd, Overton, and Zirkle, but denied as to Plaintiff's claim against Defendant Byerly. [ECF No. 41]. Plaintiff filed objections to this Court's R&R on June 1, 2010, and an oral argument on said objections was heard by District Judge Sean J. McLaughlin on July 27, 2010.  After oral argument, District Judge McLaughlin issued an Oral Order adopting this Court's recommendation that Plaintiff's claims against Defendants Overton and Zirkle be dismissed and that the DOC Defendants' motion to dismiss Plaintiff's claim against Defendant Byerly be denied; however, Judge McLaughlin declined to adopt this Court's recommendation that Plaintiff's claims against Defendant Baker and Defendant Boyd be dismissed. (See Judge McLaughlin's Oral Order dated July 27, 2010).  As a result, Plaintiff's Eighth Amendment claims against Defendants Baker, Boyd, and Byerly were allowed to proceed beyond the pleading stage.

Plaintiff subsequently obtained counsel to represent him in this action, and an amended complaint was filed on Plaintiff's behalf on May 23, 2011. [ECF No. 127].  In his amended complaint, Plaintiff reiterates his Eighth Amendment claims against Defendants Baker, Boyd, and Byerly, and also raises retaliation claims against Defendants Baker and Boyd.  Defendants filed timely answers to Plaintiff's amended complaint [ECF Nos. 128, 129], and the parties have since completed discovery.

On January 16, 2012, Defendant Baker filed a motion for summary judgment [ECF No. 135], arguing that Plaintiff has failed to state a claim under the Eighth Amendment and has failed to exhaust his administrative remedies with regard to his retaliation claim.  Defendants Boyd and Byerly filed their own motion for summary judgment on January 20, 2012 [ECF No. 139], asserting that Plaintiff cannot establish any of his claims against them.  Plaintiff has filed responses to both motions. [ECF Nos. 144, 147].  As of March 23, 2012, all parties have consented to the jurisdiction of the United States Magistrate Judge.  [ECF Nos. 152, 153, 154]. This matter is now ripe for consideration.

**B.**      **Relevant Factual History**

On October 19, 2007, Plaintiff saw Defendant Baker and informed him that he suffered a slip and fall accident that was causing extreme lower back pain. (ECF No. 127, Amended Complaint at ¶ 9).  Defendant Baker noted normal reflexes and no leg or herniated disc symptoms; but some muscle pain and mild scoliosis was noted, for which he prescribed Neurontin. (ECF No. 138-2 at p. 4).  An x-ray of Plaintiff's thoracic and lumbar spine was taken on October 22, 2007, which confirmed that Plaintiff had mild mid to lower dorsal scoliosis, as well as congenital variation of the S1 segment on the left. (ECF No. 138-4).  Plaintiff again saw Defendant Baker on November 19, 2007, at which time Defendant Baker doubled the Neurontin dosage and discontinued an anti-inflammatory medication. (ECF No. 138-2 at p. 4).

On February 10, 2008, Plaintiff was examined for neck pain by Dr. Valerie Gilreath, a staff neurosurgeon, who prescribed Prednisone, but did not alter Plaintiff's pain medications. (Id. at p. 5).  Defendant Baker followed up with Plaintiff on March 6 and 24, 2008, and noted that Plaintiff had a normal gait with no leg muscle weakness, no muscle atrophy, normal reflexes, and was able to get on and off the exam table, while shackled, without difficulty. (Id. at pp. 5-6; ECF No. 138-3 at p. 5).  Nonetheless, Defendant Baker increased Plaintiff's dose of Neurontin from 1200 mg/day to 1800 mg/day, due to Plaintiff's complaints of pain. (ECF No. 138-34, Defendant Baker's deposition transcript, at p. 39 (internal p. 77)).

In July 2008, Plaintiff underwent a course of on-site physical therapy at the request of Defendant Baker.  On July 10, 2008, the physical therapist noted that Plaintiff's reports of pain and radiating pain were inconsistent, and she recommended stretching and strengthening exercises for the lower back. (ECF No. 138-3 at p. 6).  On July 11, 2008, Defendant Baker's colleague, Dr. Bashline, recommended that Plaintiff follow-up with physical therapy in 1-2 months. (ECF No. 138-2 at p. 8; ECF No. 138-5).  After Plaintiff suffered a fall on or about July 23, 2008, Defendant Baker prescribed Soma, increased the dosage of Neurontin, and ordered an MRI, which was taken on August 15, 2008. (ECF No. 138-2 at p. 8; ECF No. 138-3 at p. 7).

The results of the MRI showed "broad-based posterior disc herniation" at L4/L5, which caused a "minor degree of left neural foramen encroachment no significant central canal stenosis." (ECF No. 138-6 at p. 2). Defendant Baker discussed these results with Plaintiff on August 28, 2008, referred Plaintiff to orthopedics for a treatment plan and recommendations, and prescribed Ultram for pain relief. (ECF No. 138-2 at p. 9; ECF No. 138-3 at p. 8).

On September 22, 2008, Plaintiff followed up with physical therapy, at which time he complained about "back stiffness almost on a daily basis." (ECF No. 138-5). Plaintiff was told to continue his exercise program and to implement good body mechanics. (Id.).

Plaintiff was scheduled for an orthopedic consult on October 10, 2008, but the appointment was canceled by the orthopedist and rescheduled for October 24, 2008. (ECF No. 138-3 at p. 9). On October 24, 2008, Plaintiff was examined by Jonathan L. Kates, M.D., an orthopedist, via webcam. (ECF No. 138-3 at p. 10). Dr. Kates noted that Plaintiff had a normal gait and got off and on the examination table without difficulty. (ECF No. 138-8 at p. 1). Dr. Kates then referred Plaintiff to his partner, Gary L. Schmidt, M.D., for further evaluation. (Id.). Dr. Schmidt evaluated Plaintiff the same day, via webcam, and noted that Plaintiff was "very argumentative and manipulative during the examination," and "would not cooperate for straight leg raise testing." (Id.). Dr. Schmidt noted further that Plaintiff had "giveway strength" during strength testing, and "really would not cooperate at either ankle." (Id. at p. 2). Dr. Schmidt did not find Plaintiff's MRI results impressive and did not believe Plaintiff had a "surgical disk." Instead, Dr. Schmidt recommended that Plaintiff go to a Pain Clinic for a left L4-5 nerve root block, and told him not to take any pain pills for his back pain, but to take an occasional Soma, a muscle relaxant. (Id.).

On October 31, 2008, Plaintiff requested an increase in his dosage of Ultram, but this request was denied by Defendant Baker as there was no indication for an increase. On the same date, Defendant Baker discontinued Plaintiff's Benadryl prescription due to misuse. (ECF No. 138-2 at p. 15; ECF No. 138-3 at p. 11). Plaintiff's Soma prescription was subsequently

continued on November 14, 2008. (ECF No. 138-2 at p. 16).

Plaintiff failed to show for a follow-up visit with Defendant Baker on November 17, 2008. (ECF No. 138-3 at p. 11).  Defendant Baker next saw Plaintiff on December 2, 2008, at which time Plaintiff's prescriptions of Soma and Neurontin were increased, and Plaintiff was referred for an EMG test. (ECF No. 138-2 at p. 16).  The EMG was performed on December 24, 2008, and the results were normal with a suggestion of "bilateral very mild remote L4 radiculopathies." (ECF No. 138-9 at p. 3).  Defendant Baker increased Plaintiff's Ultram dosage on January 8, 2009, and referred Plaintiff to Tri-State Neurological Surgeons for a determination of whether surgery was needed. (ECF No. 138-2 at p. 17; ECF No. 138-34, Defendant Baker's deposition transcript, at pp. 59-60 (internal pp. 117-118).

On February 11, 2009, Plaintiff was found to have two paper cups containing pills that he did not receive in the medication line. (ECF No. 138-34, Defendant Baker's deposition transcript, at p. 68 (internal pp. 134-35).  As a result, Defendant Baker discontinued Plaintiff's prescriptions for Soma and Neurontin, due to misuse. (Id.; ECF No. 138-2 at p. 17).

On February 25, 2009, Plaintiff was seen by Dr. Isam Khoja, a neurosurgeon, who diagnosed Plaintiff with "chronic back pain secondary to degenerative disc bulge at the level of L4-5," for which he recommended physical therapy and epidural injections by Dr. Rai (ECF Nos. 138-10 and 138-11).  Dr. Khoja also recommended that Plaintiff be started on Celebrex, hydrocodone 7.5/325, and Soma (ECF No. 138-11 at p. 3).  If Plaintiff did not show any improvement in six weeks, Dr. Khoja indicated that he "may need to undergo an L4-5 lumbar interbody fusion." (Id.).

On March 3, 2009, Defendant Baker discontinued Ultram and prescribed Vicodin 5mg "per the neurosurgeon," titrated Baclofen increasing from 5 mg to 10 mg (as a substitute for Soma), and Celebrex 200 mg. (ECF No. 138-2 at p. 18).).  In addition, Defendant Baker referred Plaintiff to Dr. Rai, a pain specialist; however, on March 6, 2009, Dr. Noel, the State Medical Director, rejected Defendant Baker's referral and alternatively ordered that conservative

treatment be continued. (ECF No. 138-12).  On March 20, 2009, Defendant Baker referred Plaintiff to Dr. Khoja for a follow-up visit, which was scheduled for April 27, 2009. (ECF No. 138-2 at p. 19).  On the same date, Defendant Baker discontinued Baclofen and reinstated the prescription for Neurontin. (ECF No. 138-2 at p. 20).

Plaintiff was subsequently seen by Dr. Khoja on April 27, 2009, at which time Dr. Khoja wrote two new prescriptions:  Methadone, 10 mg titrated to 20 mg if there is no pain improvement, and Lyrica, 50 mg at differing times for six days, then 75 mg for six weeks. (ECF No. 138-14).  Dr. Khoja also discussed with Plaintiff the option of spinal fusion surgery, and he recommended an MRI of Plaintiff's thoracic and lower cervical spine. (ECF No. 138-13 at p. 2).

On April 30, 2009, while Plaintiff was housed in the restricted housing unit ("RHU"), he "began having violent back spasms and collapsed multiple times."  During one of these spasms, Plaintiff allegedly cut his left arm on the rusted edge of a desk. (ECF No. 127, Amended Complaint, at ¶ 26; ECF No. 138-25 at p. 8).  Plaintiff buzzed the RHU control room a number of times seeking medical attention, and Defendant Byerly, the control room officer, responded by telling Plaintiff to fill out a sick call slip. (ECF No. 141-1, Defendant Byerly's deposition transcript, at pp. 35, 36, 39, 40).  Defendant Byerly also sent Defendant Boyd to Plaintiff's cell to check on Plaintiff. (Id. at p. 38; ECF No. 141-4, Defendant Boyd's deposition transcript, at p. 20).  Plaintiff then showed Defendant Boyd the cut on his arm, which Defendant Boyd described as "not bleeding to an extent" and merely needing a "Scooby-Doo Band-Aid." (ECF No. 141-4, Defendant Boyd's deposition transcript, at pp. 21, 56).  Nonetheless, Defendant Boyd was informed that medical had already been contacted. (Id. at pp. 21-24).

On May 1, 2009, Plaintiff noticed blood in his urine and notified his counselor, Michael Brumagin ("Brumagin"), that he needed to see a doctor, but that RHU control told him to fill out a sick call slip. (ECF No. 141-8, Brumagin's deposition transcript, at pp. 19, 25).  Brumagin then saw Defendant Baker and explained Plaintiff's medical condition, at which time Defendant Baker responded that unless it was an emergency Plaintiff would have to submit a sick call slip.

6

(Id. at pp. 29, 53, 55, 56).  Since, Brumagin had never seen Plaintiff have a back spasm, collapse in pain, or urinate blood, he did not think there was an emergency, so he told Defendant Byerly to tell Plaintiff to put in a sick call slip. (Id. at pp. 26, 28, 31, 47).

On May 4, 2009, Defendant Baker ordered a urine dipstick test, for which a nurse went to Plaintiff's cell and requested a urine sample. (ECF No. 138-2 at p. 21; ECF No. 127, Amended Complaint, at ¶ 36).  The next day, Defendant Baker saw Plaintiff to discuss Dr. Khoja's findings, at which time Plaintiff demanded narcotics and was described as being "belligerent, impulsive, easily argumentative." (ECF No. 138-34, Defendant Baker's deposition transcript, at p. 92 (internal pp. 182-83); ECF No. 138-3 at p. 18).  On examination, Defendant Baker noted muscle spasms and referred Plaintiff for x-rays of his cervical spine. (ECF No. 138-3 at p. 18).  Defendant Baker also prescribed Robaxin, a muscle relaxer, which was to be discontinued once Lyrica became available, and Methadone, once available, at which time Vicodin was to be discontinued.  The Lyrica and Methadone were prescribed as recommended by Dr. Khoja, although in smaller doses. (ECF No. 138-34, Defendant Baker's deposition, at pp. 93-94 (internal pp. 185-187); ECF No. 138-2 at p. 22).

On May 7, 2009, the results of Plaintiff's cervical x-rays revealed minimal degenerative changes and "cervical curve reversal suggest[ing] muscle spasm." (ECF No. 138-16).  On May 9, 2009, Plaintiff's urinalysis results returned, showing no signs of infection and no gross blood in Plaintiff's urine. (ECF No. 138-15; ECF No. 138-34, Defendant Baker's deposition transcript, at p. 104 (internal p. 207)).

On May 11, 2009, Plaintiff was seen be Daniel Telega ("Telega"), a physician's assistant, who found Plaintiff to be in no acute distress, but ordered x-rays to rule out kidney stones, which revealed only incidental findings. (ECF No. 138-2 at p. 22).  At that time, Plaintiff asked to have his Robaxin medication reinstated, but Telega denied the request, noting that Plaintiff was already on "escalating Lyrica and Methadone." (ECF No. 138-3 at p. 19).

On May 22, 2009, Defendant Baker referred Plaintiff for an MRI of the cervical and

thoracic spine, which was scheduled for July 1, 2009. (ECF No. 138-2 at p. 23).  On the same date, Defendant Baker referred Plaintiff for a follow-up visit with Dr. Khoja, which was scheduled for August 12, 2009. (Id.).  The July 1, 2009 MRI showed "minimal discogenic changes" on Plaintiff's cervical spine, with "tiny central disc protrusions ... that do not cause impingement upon the cord," and a normal thoracic spine. (ECF No. 138-19).  On July 21, 2009, Defendant Baker examined Plaintiff and reviewed with him the MRI results, noting no neural impingement and good overall pain control. (ECF No. 138-3 at p. 20; ECF No. 138-34, Defendant Baker's deposition transcript, at p. 142 (internal p. 282)).

On August 12, 2009, Dr. Khoja saw Plaintiff for the third time and noted that Plaintiff was taking Lyrica and Dolophine (also known as Methadone) and that the source of Plaintiff's neck pain was uncertain. (ECF No. 138-17).  Dr. Khoja did not recommend cervical infusion "till pain source identif[ied]," and instead recommended an epidural injection, which was previously "refused by insurance company." (Id.).  Dr. Khoja also recommended the following prescriptions for a period of six weeks: Robaxin 750 mg, Celebrex 200 mg, Lyrica 100 mg, and Methadone 20 mg. (ECF No. 138-20).

Defendant Baker followed up with Plaintiff in the RHU on August 15, 2009, noting that Plaintiff was able to get on and off the examination table without difficulty and was argumentative, demanding an increase in his medications. (ECF No. 138-3 at p. 21).  Defendant Baker noted further that Plaintiff exhibited stable gait and vital signs, no arm or leg atrophy, "no true muscle spasm" upon palpation, and no new acute leg radiculopathy. (Id. at p. 22; ECF No. 138-34, Defendant Baker's deposition transcript, at p. 145 (internal pp. 288-89)).  Defendant Baker found no medical necessity to increase Methadone, but instead maintained Plaintiff's Methadone dosage at 10 mg, but prescribed all remaining medications suggested by Dr. Khoja, at the dosages recommended. (ECF No. 138-2 at p. 25; ECF No. 138-3 at p. 22).  Defendant Baker also referred Plaintiff for an EMG, which was performed on October 8, 2009, and revealed carpal tunnel syndrome. (ECF No. 138-21).

In or around September 2009, after receiving notice of the instant lawsuit naming him as a Defendant, Defendant Baker removed himself from the day-to-day care of Plaintiff, and made himself available only for medical emergencies and reordering medications, if other doctors were unavailable to do so. (ECF No. 138-34, Defendant Baker's deposition transcript, at p. 153, 155 (internal pp. 304-5, 308)).  After that time, Plaintiff's day-to-day care was provided by Drs. Gilreath, Latizzio, and Bashline. (ECF No. 138-2 at pp. 27-38; ECF No. 138-3 at pp. 23-32).

On January 5, 2010, Plaintiff was referred to Dr. Khoja for a follow-up visit that was originally scheduled for February 8, 2010, but subsequently rescheduled for March 22, 2010. (ECF No. 138-2 at p. 29; ECF No. 138-3 at p. 25).  On March 22, 2010, Dr. Khoja examined Plaintiff and noted that Plaintiff's disc disease at the levels of C5-6 and C6-7 was "very mildly degenerative," and that Plaintiff also had "lumbar degenerative disc disease at the level of L5-S1." (ECF No. 138-29).  Dr. Khoja explained to Plaintiff that his "MRI findings and the degenerative disc changes... [were] very mild and very minimal," and that continued conservative treatment with pain medication was the best course of action. (Id.).  Dr. Khoja noted further that he did not need to see Plaintiff again unless new problems arose. (Id.).

On June 23, 2010, Plaintiff complained to Matthew DeForce ("DeForce"), a licensed practical nurse, about his Robaxin expiring. (ECF No. 138-31, Deforce deposition transcript, at p. 25).  At the time, DeForce did not think that Plaintiff appeared to be in pain, but asked Defendant Baker whether the Robaxin should be renewed. (Id. at p. 26).  Defendant Baker indicated that he was not able to treat Plaintiff because of the instant lawsuit and told DeForce to have Plaintiff put in a sick call slip to be seen by another doctor or physician's assistant. (Id. at p. 27).  The medical records indicate that Plaintiff was seen later the same day by Tammy Mowry, a physician's assistant, who found that Plaintiff was able to walk and sit on the examination table without assistance. (ECF No. 138-3 at p. 29).

On October 12, 2010, Defendant Boyd was working in the RHU when a smoke detector went off in the cell chaser that was connected to Plaintiff's cell and three other cells. (ECF No.

141-4, Defendant Boyd's deposition transcript, at pp. 30-31).[1]  A search of Plaintiff's cell was conducted by Defendant Boyd, during which Plaintiff was outside the cell. (Id. at pp. 31, 34). At least a portion of the search was witnessed by Captains Morrow and Boughner. (Id. at p. 34). Defendant Boyd went through Plaintiff's property looking for contraband, such as tobacco products and lighters, but did not remove any contraband from the cell. (Id. at p. 43).

### C.    Standard of Review

Federal Rule of Civil Procedure 56(c)(2)  provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. Fed.R.Civ.P. 56(c). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d

---

[1]

A cell chaser provides the air system for four cells. (ECF No. 141-4, Defendant Boyd's deposition transcript, at p. 31).

458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment).  The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim.  Celotex, 477 U.S. at 322.  See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue."  Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  See also El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

A material fact is a fact whose resolution will affect the outcome of the case under applicable law.  Anderson, 477 U.S. at 248.  Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 247-249.

**D.**      **Discussion**

       **1.**      **Exhaustion of Administrative Remedies**

              **a.**      **The Exhaustion Requirement**

Defendant Baker argues that Plaintiff's retaliation claim against him should be dismissed

due to Plaintiff's alleged failure to comply with the exhaustion requirements of the Prison

Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), which provides:

> no action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prisons, or other correctional facility until such administrative remedies as are available are exhausted.

Id.[2]

The requirement that an inmate exhaust administrative remedies applies to all inmate

suits regarding prison life, including those that involve general circumstances as well as

particular episodes.  Porter v. Nussle, 534 U.S. 516 (2002); Concepcion v. Morton, 306 F.3d

1347 (3d Cir. 2002) (for history of exhaustion requirement).  Administrative exhaustion must be

completed prior to the filing of an action.  McCarthy v. Madigan, 503 U.S. 140, 144 (1992).

Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available

remedies. Grimsley v. Rodriquez, 113 F.3d 1246 (Table), 1997 WL 2356136 (Unpublished

Opinion) (10th Cir. May 8, 1997).[3]  The exhaustion requirement is not a technicality, rather it is

federal law which federal district courts are required to follow.  Nyhuis v. Reno, 204 F.3d 65, 73

(3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required

exhaustion").[4]

---

[2]

It is not a plaintiff's burden to affirmatively plead exhaustion.  Jones v. Bock, 549 U.S. 199, 217 (2007) ("...failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").  Instead, the failure to exhaust must be asserted and proven by the defendants.  Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002).

[3]

Importantly, a plaintiff's failure to exhaust his administrative remedies does not deprive the district court of subject matter jurisdiction.  Nyhuis v. Reno, 204 F.3d 65, 69 n.4 (3d Cir. 2000) ("...[W]e agree with the clear majority of courts that ç1997e(a) is *not* a jurisdictional requirement, such that failure to comply with the section would deprive federal courts of subject matter jurisdiction.").

[4]

There is no "futility" exception to the administrative exhaustion requirement.  Banks v. Roberts, 2007 WL 3096585, at * 1 (3d Cir.) citing Nyhuis, 204 F.3d at 71 ("[Plaintiff's] argument fails under this Court's bright line rule that

The PLRA also requires "proper exhaustion" meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of that grievance system. Woodford v. Ngo, 548 U.S. 81, 87-91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules ..."). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective ... appeal." Id. at 83; see also Spruill v. Gillis,  372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion) (" Based on our earlier discussion of the PLRA's legislative history, [...] Congress seems to have had three interrelated objectives relevant to our inquiry here: (1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits.").

### b.        The Administrative Process Available to State Inmates

No analysis of exhaustion may be made absent an understanding of the administrative process available to state inmates. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'  The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 107 U.S. at 217.

The DC-ADM 804 grievance system, available to state prisoners, consists of three separate stages.  First, the prisoner is required to timely submit a written grievance for review by the facility manager or the regional grievance coordinator within fifteen days of the incident,

---

'completely precludes a futility exception to the PLRA's mandatory exhaustion requirement.'"). See also Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Indeed, as we held in *Booth*, a prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.").

who responds in writing within ten business days. Second, the inmate must timely submit a written appeal to intermediate review within ten working days, and again the inmate receives a written response within ten working days. Finally, the inmate must submit a timely appeal to the Central Office Review Committee within fifteen working days, and the inmate will receive a final determination in writing within thirty days. See Booth v. Churner, 206 F.3d 289, 293 n.2 (3d Cir. 1997), aff'd. 532 U.S. 731 (2001).

### c.    Analysis

Here, Defendant Baker asserts that none of the grievances Plaintiff has filed at SCI-Albion raise any claim of retaliatory conduct by Defendant Baker and, thus, Plaintiff's retaliation claim against him must be dismissed due to Plaintiff's failure to exhaust administrative remedies. In support of this assertion, Defendant Baker has submitted copies of all documents related to three grievances Plaintiff filed against him, all of which appear to have been fully exhausted, and none of which raises any claim of retaliatory action. (See ECF Nos. 138-23, 138-24, and 138-25). However, Defendant Baker has failed to authenticate these documents with a sworn declaration certifying that the grievances constitute a complete and accurate record of Plaintiff's grievance proceedings.[5] Absent such authentication, this Court cannot rely on such exhibits to definitively conclude that Plaintiff has failed to exhaust his administrative remedies as to the retaliation claim raised against Defendant Baker in this case. Accordingly, based upon the record before this Court, Defendant Baker's motion for summary judgment in this regard will be denied.

---

[5]

Indeed, Plaintiff states that he filed another grievance attempting to raise a retaliation claim against Defendant Baker; however, this grievance was rejected as being duplicative of a prior grievance. Plaintiff disputes that the grievance was duplicative and argues that the rejection of the grievance prevented him from exhausting his administrative remedies as to the retaliation claim. (See ECF No. 145, Plaintiff's Responsive Concise Statement in Response to Dr. Baker's Concise Statement of Undisputed Material Facts, at ¶ 169).

## 2.      Eighth Amendment Deliberate Indifference Claims

In the medical context, a constitutional violation under the Eighth Amendment occurs only when prison officials are deliberately indifferent to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976).  "In order to establish a violation of [the] constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need[6] involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S at 104.  Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury,  Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury"  White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

Mere misdiagnosis or negligent treatment is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation.  Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted).  Any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment.  Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979), quoting Bowring v. Goodwin, 551 F.2d 44, 48 (4th Cir. 1977).  Furthermore, deliberate indifference is generally not found when some

---

6

A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Monmouth County Correction Institute Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

level of medical care has been offered to the inmate.  <u>Clark v. Doe</u>, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care").

### a.    **Defendant Baker**

Defendant Baker argues that the voluminous medical records detailing the medical care he and other medical staff members provided to Plaintiff demonstrates that he was not deliberately indifferent to Plaintiff's medical needs.[7]  These records consist of approximately 80 Physician's Orders between October 2007 and September 2010 (not counting numerous reports from outside specialists), and approximately 85 Progress Notes between October 2007 and July 2010, many of which have been summarized in this Court's factual recitation. (ECF Nos. 138-2 and 138-3).  During these time frames, Plaintiff was prescribed a variety of pain medications and muscle relaxants, at various times, including Neurontin, Lyrica, Methadone, Robaxin, Celebrex, Vicodin, Ultram, Soma, Flexeril, ParafonForte, and Baclofen. (<u>See</u> ECF No. 137, Defendant Baker's Concise Statement of Undisputed Material Facts, at ¶ 151).  In addition, Plaintiff underwent a number of diagnostic tests, including x-rays of his cervical, thoracic and lumbar spine, MRI's of his lower back and cervical region, and an EMG test.  Plaintiff was also administered a course of physical therapy on, at least, two occasions, and was seen on one occasion by Dr. Schmidt, an orthopedic specialist, and on three occasions by Dr. Khoja, a neurosurgeon.

---

[7]

Defendant Baker first argues that Plaintiff cannot meet his burden of proving his deliberate indifference claim because he has failed to provide medical expert testimony to support his claim.  However, the Third Circuit Court has recognized that expert testimony is required only "when the seriousness of injury or illness would not be apparent to a lay person." <u>Aruanno v. Glazman</u>, 316 Fed. Appx. 194, 195 (3d Cir. 2009), <u>citing</u> <u>Boring v. Kozakiewicz</u>, 833 F.2d 468, 473-74 (3d Cir. 1987).  Here, Plaintiff's complaints of neck and back pain, and the medical findings related thereto, are not beyond a layperson's ability to comprehend the seriousness of Plaintiff's medical condition.  Thus, no medical expert testimony is required.

Notwithstanding this litany of medical treatment, Plaintiff maintains that Defendant Baker was deliberately indifferent to his medical needs during the closed period from April 30, 2009 to May 4, 2009, during which Plaintiff was experiencing back spasms and urinating blood. In particular, Plaintiff argues that "[t]he fact Defendant Baker may have treated [Plaintiff] **before** April 30, 2009, and may have treated him **after** May 4, 2009, does not change the fact that Defendant did nothing for day after day on April 30, May 1, May 2, or May 3 – despite the fact that [Defendant] Byerly testified that medical was notified of [Plaintiff's] condition on April 30. (ECF No. 144, Plaintiff's Opposition Brief, at pp. 10-11). These allegations, however, are not supported by the record.

First, the medical record demonstrates that Plaintiff failed to show for a scheduled sick call visit with Defendant Baker on April 30, 2009. (ECF No. 138-3 at p. 18). Thus, Plaintiff denied himself immediate access to medical care on the very date he complains that Defendant Baker denied treatment for his allegedly debilitating back spasms.

Second, there is no evidence of record indicating that Defendant Baker knew of Plaintiff's complaints prior to May 1, 2009, when Counselor Brumagin told him about Plaintiff's complaints of back pain and spasms, and blood in his urine.[8] (ECF No. 141-8, Brumagin's deposition transcript, at pp. 29, 53, 55, 56). At the time, Defendant Baker had been treating Plaintiff for his back pain symptoms for over eighteen months and was well aware of Plaintiff's underlying medical condition. Thus, in response to Brumagin's report, Defendant Baker told Brumagin that unless it was an emergency, Plaintiff would have to fill out a sick call slip. Neither Brumagin nor Defendant Baker considered Plaintiff's complaints to be an emergency, so Plaintiff was instructed by Brumagin to submit a sick call request. (Id. at pp. 26, 28, 31, 47; ECF

---

[8]

Although Plaintiff argues that Defendant Byerly notified "medical" of Plaintiff's complaints on April 30, 2009, Defendant Byerly testified that he spoke to the RHU nurse, who advised him to have Plaintiff fill out a sick call slip. (ECF No. 138-37, Defendant Byerly deposition transcript, at p. 44).

No. 138-34, Defendant Baker's deposition transcript, at pp. 118-119 (internal pp. 235-236)).
Three days later, on May 4, 2009, Defendant Baker ordered a nurse to obtain a urine sample
from Plaintiff, and Defendant Baker saw Plaintiff the next day, at which time Plaintiff was
prescribed Robaxin, a muscle relaxant.  In the interim, Plaintiff's pain prescription medications
were maintained and Plaintiff did not incur any injury other than a cut on his arm that Defendant
Boyd described as needing only a "Scooby-Doo Band-Aid."  Moreover, the urinalysis results
ultimately showed no signs of infection and no gross blood in Plaintiff's urine. This set of facts
hardly implicates deliberate indifference to a serious medical need.

Plaintiff also complains that Defendant Baker "repeatedly declined to increase
[Plaintiff's] methadone dosage, despite Dr. Khoja's repeated recommendations and [Plaintiff's]
numerous requests," and he "consistently refused to administer the pain and muscle relaxant
medicines prescribed by Dr. Khoja." (ECF No. 144, Plaintiff's Opposition Brief, at p. 11).  This
complaint also fails to establish deliberate indifference to a serious medical need as "mere
disagreements over medical judgment" do not rise to the level of an Eighth Amendment
violation.  White, 897 F.2d at 110.  Any attempt to second-guess the propriety or adequacy of a
particular course of treatment is disavowed by courts since such determinations remain a
question of sound professional judgment.  Inmates of Allegheny County Jail v. Pierce, 612 F.2d
754, 762 (3d Cir. 1979), quoting Bowring v. Goodwin, 551 F.2d 44, 48 (4th Cir. 1977).

Based on the foregoing, Plaintiff is unable to establish an Eighth Amendment deliberate
indifference claim against Defendant Baker, and summary judgment will be entered in favor of
Defendant Baker accordingly.


     **b.**   **Defendant Boyd**

Plaintiff's Eighth Amendment claim against Defendant Boyd arises from his allegations
that, on April 30, 2009, Defendant Boyd was aware that Plaintiff was suffering back spasms and
sustained a cut on his arm and, after checking the cut on Plaintiff's arm, told Plaintiff that he

would report the "medical emergency" to his fellow officers and send for medical help.  There is no allegation that Defendant Boyd ignored Plaintiff's injuries or refused to obtain medical care. Plaintiff simply alleges that he "was never seen or treated that day."

The Third Circuit has held that prison officials who are not physicians cannot be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.  Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993).  More recently, in Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004), the Third Circuit expanded upon its reasoning in Durmer, as follows:

> Absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill, 372 F.2d at 236.

Here, it is beyond dispute that, on April 30, 2009, Plaintiff had been under Defendant Baker's care for his back condition since October 2007.  Thus, Defendant Boyd's alleged failure to immediately seek medical attention for Plaintiff's back spasms cannot be considered deliberate indifference, in light of the treatment Plaintiff had already been receiving from Defendant Baker.  In addition, the injury to Plaintiff's left arm has been described by Defendant Boyd as "merely needing a Scooby-Doo Band-Aid," thus casting considerable doubt as to the seriousness of Plaintiff's left arm injury and his alleged need for immediate medical assistance. Furthermore, Defendant Boyd testified that, at the time he checked on Plaintiff at his cell, he had been informed that medical had already been called. (ECF No. 138-36, Defendant Boyd's deposition transcript, at p. 12 (internal pp. 22-23)).

Based on the foregoing, there is no indication from the record that Defendant Boyd acted with deliberate indifference to a serious medical need.  Accordingly, summary judgment will be granted in favor of Defendant Boyd with regard to Plaintiff's Eighth Amendment deliberate indifference claim against him.

<u>**c.**</u>      <u>**Defendant Byerly**</u>

Plaintiff claims that, on April 30, 2009, Defendant Byerly "refused to contact medical on Plaintiff's behalf and simply said, 'put in a sick call slip.'" (ECF No. 127, Amended Complaint, at ¶ 29).  The next day, Plaintiff alleges that he was still having back spasms and began urinating blood, at which time he again contacted Defendant Byerly "requested emergency medical treatment," but Defendant Byerly "again refused to call for medical treatment."  (<u>Id</u>. at ¶¶ 30-31).  The evidence of record indicates otherwise.

As an initial matter, there is no indication in the record that Defendant Byerly worked in the RHU, or was made aware of Plaintiff's medical problems, at any time other than April 30 and May 1, 2009.  Thus, Plaintiff's claim is necessarily limited to Defendant Byerly's actions on those two days.

In this context, Defendant Byerly has testified that on April 30, 2009, Plaintiff buzzed him in the RHU control room numerous times asking him to call medical because he was having back spasms and had cut his arm. (ECF No. 138-37, Defendant Byerly's deposition transcript, at p. 18 (internal p. 35)).  Defendant Byerly testified that after Plaintiff's first request for medical attention he called the RHU nurse, who told him to have Plaintiff fill out a sick call slip. (<u>Id</u>. at pp. 20, 23 (internal pp. 39, 44); ECF No. 138-25 at p. 7).   Defendant Byerly also sent Defendant Boyd to Plaintiff's cell to check on Plaintiff's condition. (<u>Id</u>. at p. 20 (internal p. 38)).  This testimony is corroborated by Defendant Boyd, who testified that he visited Plaintiff's cell on April 30, 2009, at Defendant Byerly's request, and was told by Defendant Byerly that medical had already been contacted. (ECF No. 138-36, Defendant Boyd's deposition transcript, at pp. 11-12 (internal pp. 20-23)).

Defendant Byerly testified further that on May 1, 2009, he saw Plaintiff talking in the RHU hallway to Tammy Mowry ("Mowry"), a physician's assistant, and overheard Plaintiff telling Mowry that he had blood in his urine, in response to which Mowry told Plaintiff to drink water. (ECF No. 138-37, Defendant Byerly's deposition testimony, at p. 36 (internal p.

71)).  That same day, Plaintiff saw Brumagin, his counselor, and told him he needed to see a doctor. (ECF No. 138-33, Brumagin's deposition testimony, at p. 13, (internal p. 25).  Brumagin then relayed Plaintiff's complaints to Defendant Baker, who told Brumagin that Plaintiff would have to fill out a sick call slip since his symptoms were not considered to be an emergency. (Id. at pp. 15-16 (internal pp. 29-30)).  Brumagin returned to his office to contact Defendant Byerly and tell him to have Plaintiff submit a sick call slip. (Id. at p. 18 (internal p. 34)).  Defendant Byerly then proceeded to tell Plaintiff that Defendant Baker instructed Plaintiff to submit a non-emergency sick call slip. (ECF No. 149-3, Statement of Plaintiff, at ¶ 76).

Thus, the record reflects that Defendant Byerly (i) responded to Plaintiff's calls for medical attention on April 30, 2009, by contacting the RHU nurse and relaying her instructions to fill out a sick call slip, and sending Defendant Boyd to check on Plaintiff's condition; (ii) witnessed Plaintiff discussing his medical concerns with Mowry, a medical staff member, on May 1, 2009; (iii) was informed by Brumagin that Plaintiff's medical symptoms were discussed with Defendant Baker on May 1, and that Defendant Baker told Brumagin that a sick call slip needed to be submitted; and (iv) told Plaintiff to fill out a sick call slip, as per Defendant Baker's instructions.  These undisputed facts indicate appropriate deference to the actions of medical staff and belie Plaintiff's claim of deliberate indifference as a matter of law on the part of Defendant Byerly.  Accordingly, summary judgment will be entered in favor of Defendant Byerly on Plaintiff's Eighth Amendment claim against him.

### 3.      Retaliation

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983."  See White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir.1990).  "Government actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  Mitchell v. Horn, 318 F.3d 523,

530 (3d Cir. 2003), quoting Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).

> In order to state a prima facie case of retaliation, a prisoner must demonstrate:
> 1) the conduct in which he was engaged was constitutionally protected;
>
> 2) he suffered "adverse action" at the hands of prison officials[9]; and
>
> 3) his constitutionally protected conduct was a substantial or motivating factor in the decisions to discipline him.

Carter v. McGrady, 292 F.3d 152, 157-58 (3d Cir. 2002), quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001).  Following the satisfaction of a prima facie case of retaliation, the burden then shifts to the defendants to demonstrate, by a preponderance of the evidence, that their actions would have been the same, even if Plaintiff were not engaging in the constitutionally protected activities.  Carter, 292 F.3d at 158.  "Once a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  Rauser, 241 F.3d at 334.  In evaluating a prison official's opinion, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

### a.      Defendant Baker

Plaintiff claims that after he filed the instant lawsuit, Defendant Baker retaliated against

---

[9]

To show an "adverse action," the plaintiff must demonstrate that defendants' action were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."  Allah v. Al-Hafeez, 208 F.Supp.2d 520,535 (E.D. Pa. June 24, 2002), quoting Allah v. Seiverling, 229 F.3d at 225.  See also Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994) (a plaintiff "need not show a separate, independent injury as an element of the case ... because the retaliatory disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, [and] the injury to his right inheres in the retaliatory conduct itself.").

him by refusing to provide him medical treatment.  The record does not support such a claim.

Defendant Baker explained at his deposition that it was his practice to remove himself from the day-to-day care of a patient if the patient sues him, but that he would remain involved in case of an emergency or to assist with ordering medications. (ECF No. 138-34, Defendant Baker's deposition transcript, at pp. 153-155 (internal pp. 304-309)).  In Plaintiff's case, Defendant Baker removed himself as Plaintiff's primary care provider in or around November 2009. (Id.).  From that time forward, Defendant Baker referred Plaintiff's day-to-day care to other part-time doctors and physician assistants on SCI-Albion's medical staff, including Drs. Gilreath, Latizzio, and Bashline, P.A. Mowry, and P.A. Telega. (Id. at p. 155 (internal p. 309)).  Those medical staff providers, as well as Dr. Khoja, an outside neurosurgeon, continued to monitor and treat Plaintiff for his various back ailments. (See ECF No. 138-2, pp. 28-37; ECF No. 138-3 at pp. 24-31).  In addition, Defendant Baker continued to reorder Plaintiff's methadone prescription at various times when other doctors were unavailable to do so. (See ECF No. 138-2 at pp. 29, 36-38).

Based on the foregoing, Plaintiff has failed to demonstrate that he suffered any adverse action as a result of his filing of the instant lawsuit.  The mere fact that the filing of a lawsuit prompted Defendant Baker to remove himself as Plaintiff's primary care provider did not adversely affect the treatment Plaintiff received for his medical ailments.  Thus, summary judgment will be granted in favor of Defendant Baker as to Plaintiff's retaliation claim against him.

### b.    Defendant Boyd

On October 12, 2010, Defendant Boyd and several other corrections officers conducted a search of Plaintiff's cell in the RHU, during which Plaintiff claims Defendant Boyd removed legal papers from his cell in retaliation for his Eighth Amendment claim against Defendant Boyd in this case.  In making this claim, Plaintiff suggests that the search was suspicious in

nature because it was allegedly performed under false pretenses and was conspicuously limited to Plaintiff's cell.  In particular, Plaintiff asserts that it is not clear "that a putative fire alarm and/or the presence of smoke were in fact the reasons for the search." (ECF No. 147, Plaintiff's Brief, at p. 4).

Plaintiff's assertions regarding the questionable nature of the search is debunked by the record evidence, which supports Defendant Boyd's response that the search was motivated by legitimate penological interests.  It is undisputed that on October 12, 2010, a fire alarm went off in the cell chaser that was connected to Plaintiff's cell and three other cells in the RHU. (See ECF No. 148, Plaintiff's response to Defendants Boyd and Byerly's concise statement of undisputed material facts, at p. 5, ¶ 17).  These cells were arranged in a square formation – two on top and two on the bottom. (See ECF No. 149-2, Defendant Boyd's deposition transcript, at p. 16 (internal pp. 67-68)).  At the time the fire alarm went off, two of the four cells were unoccupied because the inmates in those cells were in the yard.  (See ECF No. 149-2, Defendant Boyd's deposition transcript, at p. 9 (internal pp. 36-37)).  Because of his back problems, Plaintiff had remained in his cell, which was located on the bottom left, and the other occupied cell was located on the top right, kitty-corner to Plaintiff's cell. (Id. at p. 16 (internal pp. 67-68)).

In response to the fire alarm, the shift commander, Sergeant Wolfe, ordered available officers to report to the pod where the alarm originated.  The reporting officers included Defendant Boyd and Officers Harmon, Morales and Jablonski. (ECF No. 149-6, C.O. Harmon's deposition transcript, at p. 6 (internal p. 24)).  Defendant Boyd testified that he and other officers smelled smoke coming from Plaintiff's cell and confirmed that there was no smoke smell coming from the other occupied cell on the upper right tier. (Id, at pp. 8-9, 16 (internal pp. 36-37, 67)).[10]  This testimony is corroborated by C.O. Harmon, who testified that he was present

---

[10]

Because only two of the four cells serviced by the cell chaser were occupied at the time, it was reasonable to focus attention solely on those two cells, and to then discount the cell where no smoke was detected.

during the search and smelled cigarette smoke coming from Plaintiff's cell. (ECF No. 149-6, C.O. Harmon's deposition transcript, at p. 10 (internal pp. 39-40)). In addition, Plaintiff acknowledged that Captain Morrow was present during the search and stated that he smelled smoke coming from Plaintiff's cell. (ECF No. 149-4, Plaintiff's deposition transcript, at p. 12 (internal p. 48)). Thus, there was ample justification for focusing the ensuing search on Plaintiff's cell for contraband that may have been responsible for creating the smoke that set off the fire alarm.

Based on the foregoing, the Court finds that Defendant Boyd has met his burden of proving by a preponderance of the evidence that the search in question was motivated by the legitimate penological interest of prison security, and not by any retaliatory animus.

Nevertheless, an issue still remains as to Defendant Boyd's alleged removal of Plaintiff's legal property during the search. The record is not at all clear that any removal of legal materials occurred, or that Defendant Boyd was responsible for any such removal if it did occur. In fact, during his deposition, Plaintiff was not able to state with certainty that Defendant Boyd was responsible for removing any legal papers from his cell. Instead, Plaintiff was only able to testify that Defendant Boyd "was the only one I saw touching the papers," and that, since Defendant Boyd "brought the trash bag out of the cell," it was "pretty safe to assume" that he removed legal papers. (ECF No. 149-4, Plaintiff's deposition transcript, at p. 13 (internal pp. 49-50)). For his part, Defendant Boyd testified that he did not remove anything from Plaintiff's cell. (ECF No. 149-2, Defendant Boyd's deposition transcript, at p. 10 (internal p. 43)). This testimony was corroborated by C.O. Harmon, who testified that he did not see anyone leaving Plaintiff's cell with a trash bag. (ECF No. 149-6, C.O. Harmon's deposition transcript, at p. 9 (internal p. 34)). Moreover, the confiscated items receipt generated from the search indicates that the only items taken from Plaintiff's cell were "4 bottles, labels removed, unknown substance." (ECF No. 149-11). This receipt was signed by both the confiscating officer, C.O. Jablonski, and Plaintiff. (Id.).

However, the testimony of record does indicate that Defendant Boyd did search through all of Plaintiff's boxes of papers, and that a trash can was removed from Plaintiff's cell. (ECF No. 149-2, Defendant Boyd's deposition transcript, at p. 10 (internal p. 43); ECF No. 149-6, C.O. Harmon's deposition transcript, at p. 9 (internal pp. 33-34); ECF No. 149-4, Plaintiff's deposition transcript, at p. 13 (internal pp. 49-51)).  Also, Plaintiff has stated under oath that he asked Defendant Boyd to fill out a confiscation slip noting the documents he had allegedly taken from Plaintiff's cell, in response to which Defendant Boyd allegedly replied "if I don't, will you sue me?" (ECF No. 149-3, Statement of Plaintiff, at p. 17, ¶ 158).  Plaintiff states that he then inventoried his legal materials after the search and found several items related to the instant lawsuit missing, yet he never received a confiscated items slip listing the legal materials allegedly taken. (Id. at pp. 17-18, ¶¶ 159, 160).

Based on the foregoing, there is, at least, a genuine issue of material fact as to whether Defendant Boyd removed legal materials from Plaintiff's cell during the search of October 12, 2010, and there is a sufficient nexus to the instant lawsuit from which a fact finder may find that the alleged removal of legal materials was retaliatory in nature.  While the Court questions whether the alleged removal of the legal materials identified by Plaintiff would be considered an "adverse action" sufficient to deter a person of ordinary firmness from exercising his constitutional rights, this too is a fact issue that the Court is unwilling to resolve at this stage. Accordingly, summary judgment will be denied Defendant Boyd as to Plaintiff's retaliation claim arising from Defendant Boyd's alleged removal of legal property from Plaintiff's cell during the search of October 12, 2010.

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MICHAEL BURKE,                    )
                **Plaintiff**         )          **C.A. 09-212 Erie**
                             )
      v.                      )
                             )          **Magistrate Judge Baxter**
DR. MARK BAKER, et al.,           )
                **Defendants.**      )

AND NOW, this 10th day of April, 2012,

IT IS HEREBY ORDER, ADJUDGED, and DECREED as follows:

1.  Defendant Baker's motion for summary judgment [ECF No. 135] is GRANTED; and

2.  The motion for summary judgment filed by Defendants Byerly and Boyd [ECF No. 139] is GRANTED in part and DENIED in part, as follows:

    a.  Summary judgment is GRANTED in favor of Defendants Byerly and Boyd as to Plaintiff's Eighth Amendment deliberate indifference claims against them; and

    b.  Summary judgment is DENIED Defendant Boyd as to Plaintiff's retaliation claim arising from Defendant Boyd's alleged removal of legal property from Plaintiff's cell during the search of October 12, 2010.

/s/ Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge